UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

**UNITED STATES OF AMERICA**   *   **CRIMINAL NO. 2:22-cr-00252**

**VS.**   *   **JUDGE JAMES D. CAIN, JR.**

**BRANDON ALFRED**   *   **MAGISTRATE JUDGE KAY**

<u>**REPORT AND RECOMMENDATION**</u>

Before the court is a Motion to Suppress [doc. 30] filed by defendant Brandon Alfred. Through this motion he seeks to suppress all evidence and statements obtained during a search of his white Chevrolet pick-up truck. An evidentiary hearing was held, and the government produced testimony from Officer Jeremy Wolford, the officer who conducted the stop and search at issue, and Detective Sabrina Hayes. The court ordered supplemental briefing, which the parties have supplied. Docs. 43, 44.

Based on our review of the law, the memoranda filed by the parties, and the testimony adduced at the hearing, we **RECOMMEND** that the motion be **DENIED**.

**I.**
**BACKGROUND**

Defendant Alfred was indicted for possession of controlled substances with intent to distribute (heroin/Fentanyl) in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). Doc. 1. The indictment alleges that defendant "did knowingly and intentionally possess with the intent to distribute" a mixture and substance containing a detectable amount of heroin (100 grams or more) and Fentanyl (40 grams or more) in violation of section 841(a)(1) and (b)(1)(B). *Id.*

At the evidentiary hearing for this Motion to Suppress, the government called Detective Sabrina Hayes as a witness. Detective Hayes is employed with Calcasieu Parish Sheriff's Office and is assigned to the Combined Anti-Drug Task Force. One of her duties is investigating individuals distributing illegal narcotics. Prior to the investigation that led to defendant Alfred's arrest, Detective Hayes had participated in over 50 narcotics investigations.

Officer Wolford, who conducted the stop, search, and arrest, also testified. At the time of the arrest, Officer Wolford also was working at Calcasieu Parish Sheriff's Office as part of the Combined Anti-Drug Task Force. On the Task Force, he was assigned to the Interstate Interdiction Unit, which involved "looking for in-transit criminal activity" such as moving bulk amounts of narcotics. He was part of the Task Force for approximately four years and made "hundreds" of narcotics arrests. He got involved in the investigation of defendant Alfred when Detective Hayes informed him she was investigating Alfred for selling narcotics a couple weeks before the traffic stop currently at issue occurred. Defendant Alfred was suspected of distributing heroin.

Detective Hayes provided the following testimony: A confidential informant[1] provided law enforcement with information about defendant Alfred's distribution of illegal narcotics, specifically heroin. The informant gave information about where defendant lived, the vehicle he drove, and his travels to Texas, where he allegedly would obtain illegal narcotics to bring into Louisiana. The day before the traffic stop, the detectives traveled to the address provided by the informant, where they located the vehicle alleged to be used by defendant Alfred. They confirmed the vehicle and license plate matched the information they received. The detectives also found Facebook posts of defendant Alfred with that vehicle.

---

[1] Detective Hayes had previously used this informant one other time, and she is unsure if the subject was convicted.

Detective Hayes and Officer Wolford testified to the following: On the day of the traffic stop, Officer Wolford and Detectives Hayes, LeBlanc, Cormier, and Nunez were part of the investigation. Detective Hayes ran the license plate through the license plate readers to determine if the vehicle was traveling to Texas. Instead, she found that the vehicle was traveling eastbound on Interstate 10 ("I-10") from Texas toward Louisiana. Detective Hayes advised Officer Wolford that she believed Alfred was coming back from Texas driving a white Chevrolet Silverado.

Detectives Cormier and LeBlanc were stationed on I-10 around mile marker 8 in an unmarked vehicle and waiting to identify Alfred when he approached their position. Detectives Nunez and Hayes were around mile marker 16 on I-10, also in an unmarked vehicle. Officer Wolford was waiting in a marked police vehicle around mile marker 19 on I-10 in Sulphur, Louisiana. This investigative team was in constant communication with each other using a dispatch radio channel for narcotics.

Once Cormier and LeBlanc identified defendant Alfred, they informed Nunez, Hayes, and Wolford and conducted mobile surveillance by following him until Nunez and Hayes began surveillance. Detectives Hayes and Nunez saw the vehicle near mile marker 16, and they observed that Alfred was alone inside the vehicle.[2] Detective Hayes relayed this information to the other detectives and Office Wolford.

Around mile marker 18, she and Detective Nunez observed Alfred driving in the middle lane of travel and then drifting, causing his driver's side tires to come in contact with the white dashed lines. She again radioed this information to the other detectives and Officer Wolford. Around mile marker 19, Officer Wolford began surveilling Alfred, and Detectives Nunez and

---

[2] Detective Hayes explained that they knew what Alfred looked like from the Facebook posts previously mentioned and, with that knowledge, confirmed that he was the one driving the vehicle.

Hayes used the left lane to pass by and remain in front of Alfred so Officer Wolford could clearly view any traffic violations.

As defendant Alfred approached Wolford's position, his vehicle began slowing down and maintained a slower speed longer than the rest of the cars around him. This action made the defendant's vehicle stick out to Wolford because it is the type of action he was trained to observe in interdiction training. Officer Wolford began following defendant in the far-right lane of travel while defendant was in the middle lane, which he claims allows him to better observe the driver's movements in the vehicle than if he was in the same lane as the vehicle he is following. As he watched defendant Alfred, Wolford noted that Alfred drifted close to the left lane markers. Wolford believed, based on his training and experience, that this drifting indicated that Alfred was looking out of his passenger side mirror to watch Wolford. Officer Wolford claimed this is a common occurrence when people are preoccupied with a police vehicle's presence.

Defendant Alfred committed two traffic violations while Wolford was following him. First, his driver's side tires came in contact with the dashed lines when he drifted left. As soon as he observed this traffic violation, Wolford activated his dash camera.[3] Officer Wolford explained that the dash camera's footage is "nowhere near as clear" as a person's vision, so the video does not capture everything he saw in real time. He also admitted that defendant's infraction is very hard to see on the dash camera footage. From their position in front and to the left of defendant, Detectives Hayes and Nunez did not see this traffic violation. However, Detective Hayes testified that she was not actively watching Alfred's vehicle once Wolford took over surveillance because she did not want to be seen looking into the vehicle.

---

[3] The footage from the dash camera was introduced at the hearing, and both sides discussed the video with Wolford.

The second violation occurred when defendant Alfred exited the interstate: his passenger side tires touched the solid white fog line of the exit lane, which Officer Wolford knew to be a traffic violation of failure to maintain the lane of travel.[4]  Detective Hayes testified that, at this point, she and Detective Nunez were behind Officer Wolford in the exit lane, so they did not have a visual on defendant's vehicle during this traffic violation.  Officer Wolford acknowledged the possibility that a change in the surface of the road could have caused this violation.  He also stated that if he could, without a doubt, say that the change in the road's surface was the sole cause of the violation (and that it was the only violation) he would not have conducted a stop.  However, Wolford did not believe the change in road surface caused the violation.  Officer Wolford then conducted the traffic stop in a gas station parking lot.[5]  Detectives Hayes and Nunez were parked across the street with a clear view of the traffic stop.

During the stop, Officer Wolford noticed "an obvious and apparent" odor of marijuana emitting from the vehicle as soon as the defendant rolled down the window.  Wolford also noticed marijuana "shake"[6] on the defendant's clothing.  Officer Wolford asked defendant Alfred for his license, registration, and proof of insurance, which Alfred advised he did not have.  Instead, Alfred produced a Texas identification card.  Wolford noticed that Alfred kept looking down and to the left, toward the pocket in the driver's side door, which Wolford asserted usually indicates that there is something in the car such as a firearm or narcotics.

Officer Wolford then asked Alfred to step out of the vehicle, and Alfred complied.[7]  After Wolford explained that Alfred was being pulled over for the traffic violations, Alfred explained

---

[4] This instance was also captured in the dash camera footage shown and discussed at the hearing.

[5] At the hearing, the government offered into evidence Officer Wolford's body camera footage of the traffic stop.

[6] Officer Wolford explained that marijuana "shake" is like crumbs of marijuana that usually fall off the paper when someone is rolling a marijuana cigarette.

[7] Detective Hayes testified that she did not see defendant return to the vehicle after he exited it.

that his vehicle had tire and brake issues that caused it to pull to the left, but he did not deny the violations.  Because defendant Alfred was suspected of participating in in-transit criminal activity, Wolford asked about his travel itinerary.  The defendant claimed he was coming from a casino in Vinton, Louisiana.  Wolford asked about details of this alleged trip to Vinton, such as how long Alfred was there, to which he did not receive a direct answer.  According to Wolford, defendant exhibited signs of stress during this exchange, such as stretching only when he talked about Vinton, gambling, and the specifics of that trip but not doing so before those topics arose.  Based on his training and the information from the license plate readers, Wolford believed this story about Vinton was a lie.

Wolford also confronted Alfred about the smell of marijuana.  Defendant Alfred said there was a small baggie of marijuana in his pocket and that was where the "shake" originated.  Officer Wolford then removed an open bag of marijuana from Alfred's pocket, without consent, handcuffed Alfred, and read him his *Miranda* rights.  However, he also told Alfred that he was not under arrest at that time;[8] the handcuffs were a precaution since contraband was already found on Alfred's person.  Officer Wolford testified that he was not sure at that point if the bag removed from defendant's pocket was the source of the smell.

Wolford thus asked if there was additional contraband in the vehicle, to which Alfred said no.  However, Wolford explained—based on his experience as a member of the Anti-Drug Task Force—that if he finds marijuana on someone's person outside the vehicle, it is more probable than not that the vehicle contains additional marijuana as well as paraphernalia for the consumption of the marijuana already found.  He also explained that in his experience, some people try to

---

[8] Officer Wolford explained that he normally advises people he pulls over that he is not going to arrest them for the smaller infraction so they do not feel stress about that issue.  He claimed that if the person continues to show signs of stress, that indicates to him that something else is going on to cause the stress, which could include criminal activity.

employ a tactic of getting out of the car and admitting to a small amount of something minor like marijuana being on their person in hopes that law enforcement will not search the vehicle to look for further elements of the crime.

Wolford then conducted a probable cause search of the vehicle, starting with the driver's side door pocket. In that pocket, Wolford immediately located a large block of approximately eight ounces of a light brown substance wrapped in saran wrap that looked like heroin.[9] In Officer Wolford's experience, a block of that size is usually broken off of a larger block or brick after it crossed the border. Officer Wolford returned to Alfred, asked him about it, and placed him under arrest for possessing the contraband. Detective Hayes later performed a secondary search of the vehicle, but she did not find any more marijuana or narcotics.

Defendant Alfred filed the instant motion to suppress the statements he made to Wolford as well as all evidence collected during the stop and search. Doc. 30. Specifically, defendant claims both the initial traffic stop and the subsequent search of the vehicle were unconstitutional because both were conducted without a warrant or probable cause. *Id.* The government opposes the motion, arguing that the traffic stop, search, and arrest were all lawful. Doc. 36.

## II
## LAW AND ANALYSIS

The Fourth Amendment protects an individual's right to be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. The remedy for evidence seized by law enforcement in violation of the Fourth Amendment is the exclusion at trial of all evidence that is derivative of an illegal search, also known as the "fruit of the poisonous tree." *United States v. Singh*, 261 F.3d 530, 535 (5th Cir. 2001). This exclusionary remedy is not a personal constitutional right, but a remedy aimed at preventing police misconduct.

---

[9] The substance later tested positive for heroin, Fentanyl, and Tramadol.

*See United States v. Leon*, 104 S. Ct. 3405, 3412 (1984) (quoting *United States v. Calandra*, 94 S. Ct. 613, 620 (1974) ("The rule thus operates as 'a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.'")).

The burden generally rests on the defendant to show, by a preponderance of the evidence, that the material in question was seized in violation of his constitutional rights. *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993). However, where the search is conducted without the benefit of a warrant, then the burden shifts to the government to prove by a preponderance of the evidence that its actions were constitutional. *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001).

The constitutionality of a traffic stop is analyzed under the two-part framework promulgated by the Supreme Court in *Terry v. Ohio*. 88 S. Ct. 1868, 1883–85 (1968). The *Terry* test requires courts to "determine whether the stop was justified at is inception," and, if so, "'whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop of the vehicle in the first place.'" *United States v. Andres*, 703 F.3d 828, 832 (5th Cir. 2013) (quoting *United States v. Macias*, 658 F.3d 509, 517 (5th Cir. 2011)). An analysis of a traffic stop under *Terry* also mandates that courts "allow law enforcement officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004) (citation and internal quotation marks omitted).

### A. *Constitutionality of the Initial Stop*

The initial inquiry under *Terry* is satisfied if the officer has "an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur,

before stopping the vehicle." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005). Additionally, "[s]o long as a traffic law infraction that would have objectively justified the stop had taken place, the fact that the police officer may have made the stop for a reason other than the occurrence of the traffic infraction is irrelevant for purposes of the Fourth Amendment." *Goodwin v. Johnson*, 132 F.3d 162, 173 (5th Cir. 1997) (citing *Whren v. United States*, 116 S. Ct. 1769, 1774 (1996)).

The government contends that Officer Wolford had reasonable suspicion that the defendant committed a traffic violation due to the collective knowledge doctrine as well as his own observation of two traffic violations. Doc. 43, pp. 9–10. Under the collective knowledge doctrine, "'probable cause can rest upon the collective knowledge of the police, rather than solely on that of the officer who actually makes the arrest,' when there is 'some degree of communication between the two.'" *United States v. Ashley*, 569 F.2d 975, 983 (5th Cir. 1978) (quoting *Moreno-Vallejo v. United States*, 414 F.2d 901, 904 (5th Cir. 1969)). *See Illinois v. Andreas*, 103 S. Ct. 3319, 3324 n.5 (1983) (stating, "where law enforcement authorities are cooperating in an investigation, as here, the knowledge of one is presumed shared by all.").

The government asserts that Detective Hayes, while being in constant contact with Officer Wolford and the other detectives, informed them via radio that she observed defendant commit a traffic violation of failure to maintain the lane as the driver's side tires of the vehicle defendant was operating touched the dashed white line. Doc. 43. The witness testimony of both Officer Wolford and Detective Hayes supports this characterization of the facts. The government concludes that due to the collective knowledge doctrine, Detective Hayes relaying to Officer Wolford information about a traffic violation she witnessed gave Officer Wolford reasonable suspicion that defendant committed a traffic violation. *Id.* at p. 9. Defendant does not address this

argument but instead focuses on the traffic violations Officer Wolford witnessed for himself. *See* doc. 44, pp. 4–6.

The government further asserts that Officer Wolford personally observed defendant commit two additional traffic violations, and thus, that probable cause existed even without the collective knowledge doctrine. Doc. 43, pp. 9–10. Defendant contends, however, that Officer Wolford did not have reasonable suspicion that a traffic violation occurred when he stopped defendant. In support, defendant claims Officer Wolford testified that it is possible that, during the first violation, defendant's tire did not touch the white dashed line and that the violation is very difficult to view on the dash camera video. Doc. 44, pp. 4–5. Additionally, Detective Hayes testified that she did not observe the first traffic violation Officer Wolford claimed to see. *Id.* at p. 5. Defendant claims Detective Hayes "testified that she never lost sight of Mr. Alfred's vehicle once [Officer] Wolford began conducting surveillance." *Id.* As to the second traffic violation, defendant claims that a change in the surface of the road could have caused the violation and that Detective Hayes did not see this violation occur either. *Id.* at pp. 5–6.

Viewing the circumstances in the light of Wolford's years of experience,[10] we agree with the government and find that reasonable suspicion arose for Officer Wolford to stop defendant's vehicle. Detective Hayes radioed Officer Wolford and the other detectives that she saw the vehicle believed to belong to defendant Alfred around mile marker 16 on I-10 and that defendant Alfred was the driver and sole occupant. While conducting mobile surveillance of the defendant, Detective Hayes again radioed Officer Wolford and the other detectives, this time to inform them

---

[10] Wolford testified that he had worked in law enforcement for three years before being assigned to the Combined Anti-Drug Task Force at the Calcasieu Parish Sheriff's Office. Additionally, prior to defendant's arrest, Wolford had conducted interdiction patrols as part of the Combined Anti-Drug Task Force for four years and had made hundreds of narcotics arrests.

that the previously identified vehicle contacted the white dashed lines,[11] which gave Officer Wolford reasonable suspicion that defendant committed a traffic violation.

As to the violations Officer Wolford personally witnessed, we agree with defendant that it is very difficult to see the violations on the dash camera footage.  However, Officer Wolford explained the dash camera footage is nowhere near as clear as a person's vision, so it does not capture everything he saw in the moment. He asserted that, based on what he saw in real time, he believed the driver's side tires contacted the dashed white line during the first traffic violation he observed.  Furthermore, Detective Hayes testified that once Officer Wolford began surveilling defendant, she and Detective Nunez positioned their vehicle ahead of and one lane over from defendant's vehicle and stopped actively watching defendant's vehicle.

Concerning the second violation that Officer Wolford observed, the court notes that the dash camera footage shows the passenger side tires of defendant's vehicle coming into contact with the solid white line.  Though there was a change in the road's surface at the spot where the violation occurred, Officer Wolford doubted that external factor caused the violation.  Though defendant is correct that Detective Hayes said she did not see this violation, she also explained during the hearing that she was traveling behind Officer Wolford's vehicle at the time and thus, did not have a visual on defendant's vehicle.  Therefore, we find that, under the circumstances, the officer acted reasonably in conducting a warrantless stop.

---

[11] Under Louisiana law, "[a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety." LA. REV. STAT. § 32:79.   Violating this law is commonly referred to as "improper lane usage." *See e.g.*, *State v. Johnson*, 196 So. 3d 26, 28 (La. App. 2 Cir. 5/18/16).  Such a violation gives law enforcement officers probable cause to believe a traffic violation occurred, and thus, a traffic stop is justified. *United States v. Hernandez*, 744 F. App'x. 873, 874 (5th Cir. 2018) (citing *Whren v. United States*, 116 S. Ct. 1769, 1772 (1996)).

### B. Constitutionality of the Prolonged Stop and the Subsequent Search

The second portion of the *Terry* framework requires that the "detention . . . be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Brigham*, 382 F.3d at 507. During the traffic stop, officers may ask about the purpose and itinerary of a driver's trip and run a computer check. *Id.* at 508. However, "once all relevant computer checks have come back clean, there is no more reasonable suspicion, and, as a general matter, continued questioning thereafter unconstitutionally prolongs the detention." *Lopez-Moreno*, 420 F.3d at 431. The stop may continue if the government can show an exception to the Fourth Amendment applies. *United States v. Pena-Gonzalez*, 618 F. App'x 195, 198 (5th Cir. 2015). A common exception derived from *Terry* permits extension of the stop if reasonable suspicion of additional criminal activity emerges or existed in the first place. *Id.* (citing *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015)).

### 1. Reasonable Suspicion of Additional Criminal Activity

Reasonable suspicion exists where an officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure." *Lopez-Moreno*, 420 F.3d at 430. Reasonable suspicion requires an amount of proof "considerably less than proof of wrongdoing by a preponderance of the evidence" and "obviously less than is necessary for probable cause." *Navarette v. California*, 134 S. Ct. 1683, 1687 (2014) (quotations omitted). If additional grounds for suspicion emerge after the initial stop, the stop may extend "as long as is reasonably necessary" for the officer to resolve such suspicion. *United States v. Fishel*, 467 F.3d 855, 856 (5th Cir. 2006) (quoting *Brigham*, 382 F.3d at 512). A court's determination of the existence of reasonable suspicion requires an examination of "the totality of the circumstances in the situation at hand, in light of the individual officers' own training and

experience." *United States v. Monsivais*, 848 F.3d 353, 357 (5th Cir. 2017) (quoting *United States v. Arvizu*, 122 S. Ct. 744, 750 (2002)) (internal quotations omitted).

The government contends that the "plain smells" extension of the "plain view" doctrine provided Officer Wolford with reasonable suspicion of additional criminal activity beyond the traffic violations. Doc. 36, pp. 8–9 (citing *United States v. Ryles*, 988 F.2d 13, 14 n.2 (5th Cir. 1993) (finding that the smell of burning marijuana provided probable cause to search a van without a warrant)). The government thus asserts that the smell of marijuana emanating from the vehicle, alone, provides reasonable suspicion of criminal activity. Doc. 43, p. 13. The government also posits that the following "specific and articulable facts," when taken together, indicated criminal activity such that Officer Wolford had reasonable suspicion to support extending the stop: Detective Hayes told Officer Wolford that defendant Alfred was a heroin trafficker on his way back to Lake Charles after resupplying his narcotics in Texas; defendant's driving habits were suspicious and consistent with someone involved in in-transit criminal activity; defendant glanced at the driver's side door pocket multiple times during his encounter with Officer Wolford; defendant claimed he was coming from Vinton when Wolford knew he was coming from Texas; and Wolford smelled marijuana in the vehicle and saw marijuana "shake" on defendant's person. *Id.* at pp. 12–13.

Defendant maintains that Wolford had no reasonable suspicion that an additional crime was being committed and thus no basis to prolong the detention to investigate suspected drug trafficking activity. Doc. 44, p. 8. He also claims Officer Wolford "never articulated any reasoning or logic during his testimony as to how he was able to come to know that Mr. Alfred was lying" when questioned about his travel itinerary but was instead acting on a mere hunch. Doc. 44, p. 7.

We first note that Officer Wolford testified that prior to this stop, he had received training in detecting and identifying the odor of marijuana and had applied that training in hundreds of traffic stops. Thus, based on his training and experience, we find Officer Wolford's conclusion that the "obvious and apparent" odor he smelled was from marijuana to be a credible and articulable fact giving rise to reasonable suspicion that marijuana was present in the vehicle. *United States v. Robertson*, 16 F. Supp. 3d 740, 746 (M.D. La. 2014). Because Officer Wolford had reasonable suspicion of additional criminal activity, the prolonged stop did not violate the Fourth Amendment.

Additionally, we agree with the government that other facts also give rise to reasonable suspicion. First, contrary to defendant's assertion, Officer Wolford was not acting on a mere hunch when he determined that defendant was lying about his travel itinerary. Detective Hayes testified at the hearing that license plate readers showed defendant's vehicle was traveling from Texas toward Louisiana on the day of the stop. Detective Hayes advised Officer Wolford of this information before the team departed to station themselves along I-10 to wait for defendant. Therefore, Officer Wolford had knowledge that defendant was coming from Texas, not Vinton, Louisiana, on the day in question and thus, that defendant was lying about his travel itinerary.

Furthermore, Officer Wolford testified that based on his training and experience, defendant exhibited signs of dishonesty while telling him about defendant's alleged time in Vinton, including not giving direct answers to Wolford's questions. Moreover, Officer Wolford received information from Detective Hayes that the defendant was a heroin trafficker moving product from Texas to Lake Charles. When taken together, these facts reasonably warrant the search of defendant's vehicle. Thus, reasonable suspicion of additional criminal activity supported the prolonged stop, and the Fourth Amendment was not violated.

-14-

### 2.  *Probable Cause to Search the Vehicle*

A police officer has probable cause to conduct a search when "the facts available to [him] would 'warrant a [person] of reasonable caution in the belief'" that contraband or evidence of a crime is present. *Florida v. Harris*, 133 S. Ct. 1050, 1055 (2013) (quoting *Texas v. Brown*, 103 S. Ct. 1535, 1543 (1983) (plurality opinion)) (brackets in original).  Probable cause requires only a "fair probability," not 100% certainty, that contraband would be found. *Id.*  In evaluating whether the government has met this standard, we look to the totality of the circumstances. *Id.*

The government asserts that the smell of marijuana emanating from the vehicle, alone, provided probable cause to search the vehicle. Doc. 43, p. 13.  The government also contends that defendant's suspicious behaviors—i.e., his driving habits, multiple glances at the car door pocket, and lying about his travel itinerary—combined with the marijuana smell and the crumbs on his person as well as Officer Wolford's knowledge of defendant's alleged drug trafficking provided probable cause for the search. *Id.*

Defendant asserts that once Officer Wolford found the marijuana in defendant's pocket, he "had located the source of the marijuana smell outside the vehicle," so there was no reasonable suspicion or probable cause to believe marijuana would be found in the vehicle. Doc. 30, att. 1, p. 6; Doc. 44, p. 8.  Defendant also stresses that Officer Wolford did not find any other marijuana in the vehicle. *Id.*  Defendant asserts that because Officer Wolford said he was not going to arrest defendant for the marijuana found on defendant's person, he did not have probable cause to search the vehicle. Doc. 44, p. 8.  Defendant relies on *United States v. Robertson*, 16 F. Supp. 3d 740 (M.D. La. 2014) to support this position.

We first note that the defendant ignores the full reason why the *Robertson* court found that no probable cause to search the vehicle existed: (1) the officer was not going to write the defendant

a ticket for any conduct and (2) *the officer was going to allow the defendant to leave the scene*. *United States v. Robertson*, 16 F. Supp. 3d at 747.  In the matter at hand, Officer Wolford did not tell defendant he was free to go; on the contrary, defendant was handcuffed when Officer Wolford said he would not arrest defendant for the marijuana on his person.  Thus, this case is distinguishable from *Robertson*.

We disagree with defendant's assertion that once Officer Wolford found the marijuana in defendant's pocket, he no longer had probable cause to search the vehicle.  The cases defendant cites to support this position are not on point: both cases deal with warrantless searches of a vehicle's trunk, but the evidence at issue here was found during a warrantless search of the passenger compartment of the vehicle.  *See* doc. 30, att. 1, p. 5 (citing *United States v. Nielsen*, 9 F.3d 1487 (10th Cir. 1993) and *California v. Acevedo*, 111 S. Ct. 1982 (1991)).

Defendant admitted to Officer Wolford that he had marijuana in his pocket, and Officer Wolford then removed an open bag of marijuana from defendant's person.  Though Wolford testified at the hearing that it is possible that the marijuana odor was from that bag, he was not sure it was the source of the smell.  He also explained that in his experience, when he finds marijuana on someone's person outside the vehicle, it is common to find more marijuana and/or paraphernalia for the consumption of the marijuana he already found.  He further said that admitting to having small amounts of marijuana while outside the vehicle, like defendant did here, is a tactic he has seen employed by people who want to prevent officers from searching the vehicle for further elements of a crime.  When drugs or drug paraphernalia are found on the driver's person during a stop, the law enforcement officer has probable cause to believe there are illegal drugs in the car. *See Wyoming v. Houghton*, 119 S. Ct. 1297, 1300 (1999) (finding that a hypodermic needle in the driver's shirt pocket gave police officers probable cause to search the car and a passenger's purse).

Thus, we find that the marijuana found in defendant's pocket gave Office Wolford probable cause to search defendant's vehicle.  Accordingly, the search of defendant's vehicle did not violate the Fourth Amendment.

### III
### CONCLUSION

For the reasons given, we **RECOMMEND** that the Motion to Suppress [doc. 30] be **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days from receipt of this Report and Recommendation to file written objections with the Clerk of Court.  Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days of receipt shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1429–30 (5th Cir. 1996).

THUS DONE AND SIGNED in Chambers this 18th day of December, 2023.

_____
KATHLEEN KAY
UNITED STATES MAGISTRATE JUDGE